623 F.2d 780
 104 L.R.R.M. (BNA) 2739, 89 Lab.Cas. P 12,112
 John R. SEYBERT and Victor Soto, Plaintiffs,
Victor SOTO, Plaintiff-Appellant,
v.
Robert LOWEN, as International Secretary-Treasurer of the
InternationalOrganization of Masters, Mates and Pilots of
America, AFL-CIO, and theInternational Organization of
Masters, Mates and Pilots of America, AFL-CIO, Defendants-Appellees.
 No. 601, Docket 79-7505.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 4, 1980.
Decided May 29, 1980.
 
 Daniel E. Clifton, Ruskin & Gyory, New York City, for plaintiff-appellant.
 Seymour M. Waldman, Burton M. Epstein, New York City, for defendants-appellees.
 Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 This action was commenced in the United States District Court for the Southern District of New York by John R. Seybert and Victor Soto, two members of the Offshore Division of the International Organization of Masters, Mates & Pilots of America, AFL-CIO ("International" or "IOMM&P"), seeking the return of monies paid to the IOMM&P during the period 1974 through 1977 by virtue of an allegedly unauthorized per capita tax levied on the Offshore Division.[1] Plaintiff-appellant Soto appeals from a judgment entered on June 29, 1979 by the Honorable Constance Baker Motley, dismissing the complaint against defendants-appellees IOMM&P and that organization's Secretary-Treasurer, Robert Lowen. For the reasons we detail below, we affirm that judgment.
 
 
 2
 The allegedly unauthorized per capita tax here challenged was imposed as a result of certain actions taken at the International's Conventions held in 1973 and 1974. To provide the necessary factual background for the issues raised in this litigation, we outline the key events which occurred in the relevant time period.
 
 
 3
 By 1973, due primarily to depressed economic conditions, both the International and the Offshore Division were experiencing grave financial difficulties.[2] Consequently, when the IOMM&P held its regular Convention in October, 1973, the fiscal crises facing both the IOMM&P and the Offshore Division were prime agenda items. The delegates to the Convention were made aware that some source of increased revenues had to be located in order to stave off the impending bankruptcies of both bodies.
 
 
 4
 During this 1973 Convention the IOMM&P's Finance Committee met to consider alternative ways of assuring the future solvency of the IOMM&P and the Offshore Division, and decided that an increase in the dues of Offshore Division members provided the best solution. In the past, Offshore Division members paid quarterly dues of $75 ($300 annually) to the Offshore Division, which in turn made quarterly per capita payments of $7.50 ($30 annually) per member to the IOMM&P. Under the Finance Committee's proposal, the annual dues for Offshore Division members would be increased by an amount equal to 6% of each member's annual vacation pay, and the Finance Committee also contemplated that 10% of this increased amount would accrue to the IOMM&P in the form of an increased annual per capita assessment.
 
 
 5
 To implement these proposals, certain provisions of the IOMM&P Constitution and of the Offshore Division By-Laws required amendment. Under the existing IOMM&P constitutional provisions quarterly per capita payments were to be of fixed amounts. The proposed amendment was designed to restate these payments as minimum amounts rather than as fixed amounts,[3] and it was submitted to the IOMM&P membership. Also, a proposed amendment designed to increase the annual dues payable by members of the Offshore Division in an amount equal to 6% of each member's annual vacation pay was submitted to the membership of that body.[4] Each proposed amendment obtained the approval of its respective constituency in separate 90 day secret mail ballot referenda.
 
 
 6
 In August, 1974, the IOMM&P held another Convention, during which the Finance Committee examined various reports and projections relating to the fiscal condition of the IOMM&P and the Offshore Division. These documents incorporated the 6% vacation pay increase in the annual dues payable by members of the Offshore Division, and the 10% of this sum that was to be paid by the Offshore Division to the IOMM&P as an addition to the annual per capita assessment. The Finance Committee found that these documents were in order and fairly represented the fiscal condition of the IOMM&P and the Offshore Division. A "partial report," embodying in very general terms these conclusions of the Finance Committee, was read to and approved by the delegates at the Convention. At some later point in 1974, both the increase in Offshore Division membership dues and the additional per capita tax assessed by the IOMM&P against that body were implemented.
 
 
 7
 The next IOMM&P Convention was not held until 1977. During this Convention, the first one at which plaintiff-appellant Soto was a delegate, a proposal was made to increase the annual per capita assessment payable by the Offshore Division to the IOMM&P from 10% to 25% of the amount of Offshore Division membership dues. Allegedly, at this time, plaintiff-appellant Soto and others first learned that since 1974 the IOMM&P had been receiving 10% of all Offshore Division dues, including the 6% vacation pay increase.[5] Accordingly, in March, 1977, the present action was instituted, seeking the return of the increased per capita assessments collected by the IOMM&P from the Offshore Division between 1974 and 1977, on the theory that such payments constituted a dues increase that could not be implemented absent compliance with the mandatory provisions of § 101(a)(3)(B) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a)(3)(B).
 
 
 8
 After considering the stipulated facts and the evidence offered at trial, the District Court dismissed the complaint and rendered judgment for the defendants. The District Court advanced three alternative rationales in support of its decision: (1) the application of the 10% per capita assessment to the vacation pay increase in Offshore Division membership dues did not impose any additional financial burden on the members of that subordinate body, and therefore could not be regarded as an increase in membership dues governed by the mandatory provisions of 29 U.S.C. § 411(a)(3); (2) the increase in the per capita assessment had received the approval of the delegates at the August, 1974 IOMM&P Convention; and (3) the increase in the per capita assessment was effected pursuant to a proper interpretation of the IOMM&P Constitution by officers of the IOMM&P. We base our affirmance on the first rationale advanced by the District Court, and hence find it unnecessary to place reliance on the other two.
 
 
 9
 The issue on this appeal principally involves the proper interpretation of 29 U.S.C. § 411(a)(3), the statute which sets forth the procedures that must be followed by both local and international labor organizations when those bodies seek to increase the "rates of dues" payable by their members.[6] Obviously the District Court was correct in holding that the "rates of dues" payable by Offshore Division members had been increased by the additional appropriation of 6% of each member's annual vacation pay. However, the District Court also properly found that this dues increase was submitted to, and received the approval of, the membership of the Offshore Division in a process that complied with 29 U.S.C. § 411(a)(3)(A). Thus the dispute centers around whether the District Court correctly held that the additional per capita assessment levied by the IOMM&P on the Offshore Division and payable out of the dues increase was not an increase in the "rates of dues," and that consequently the IOMM&P was not required to comply with the provisions of 29 U.S.C. § 411(a)(3)(B) prior to taking such action.
 
 
 10
 In so classifying the additional per capita assessment, the District Court relied on the test laid down in King v. Randazzo, 234 F.Supp. 388 (E.D.N.Y.1964), aff'd, 346 F.2d 307 (2d Cir. 1965), for determining whether a particular assessment constitutes a dues increase: "Whether there has been an increase in dues must be determined not by who imposed the exaction but by the nature of the imposition and its direct effect upon the financial burden of the individual members." Id. at 394. After applying this test to the per capita assessment at issue here, the District Court concluded that "the (IOMM&P's) imposition of (the per capita assessment) had no effect whatsoever upon the financial burdens of the individual members of the Offshore Division." Although we agree with the approach so taken by the District Court, and the conclusion thereby reached, we acknowledge that the result reached here is in seeming conflict with the holding in Local 2, International Brotherhood of Telephone Workers v. International Brotherhood of Telephone Workers, 362 F.2d 891 (1st Cir.), cert. denied, 385 U.S. 947, 87 S.Ct. 321, 17 L.Ed.2d 226 (1966). Accordingly, we will set forth our reasons for not adopting the holding of Local 2.
 
 
 11
 The notion that there is a distinction between "rates of dues," which may be increased only after compliance with the relevant provisions of 29 U.S.C. § 411(a)(3), and "per capita taxes," which may be assessed without regard for the procedures mandated by 29 U.S.C. § 411(a)(3), was first enunciated in Ranes v. Office Employees International Union, Local 28, 317 F.2d 915 (7th Cir. 1963).
 
 
 12
 In Ranes, a "per capita tax" was defined as "(t)he charge per member payable periodically, usually monthly, by a local union to the national or international union with which it is affiliated. The per capita tax is a charge against the local union, not its members, collected by the parent union in lieu of a dues assessment."[7] In that case the court stated:
 
 
 13
 When Congress provided methods for increasing "rates of dues" in subsection (B) we think it intended what the plain language of the statute says. We, accordingly, reject plaintiffs' argument that that subsection should be interpreted to apply to per capita taxes. We should be reluctant to attribute to Congress either a lack of knowledge of the distinction between "dues" and "per capita taxes" in labor-union parlance or the lack of ability to articulate its intent.
 
 Id. at 918 (footnote omitted).[8]
 
 14
 Realizing that a distinction based purely on labels might be subject to abuse, the court in King v. Randazzo, supra, attempted to formulate an analysis that would separate "true" per capita taxes from devices that, although labeled as "per capita taxes," actually were disguised dues increases which labor organizations sought to impose on their members without the necessity of first complying with the procedures mandated by 29 U.S.C. § 411(a)(3). Thus, the court in King v. Randazzo promulgated the "financial burden test" as a method of distinguishing between "true" per capita taxes and disguised dues increases. See 234 F.Supp. at 394.
 
 
 15
 Curiously, in Local 2, supra, the First Circuit embraced the "financial burden test" of King v. Randazzo, yet appeared to conclude that proper application of this test would require all per capita taxes, "true" or otherwise, to be classified as "dues increases," and so could not be imposed unless the provisions of 29 U.S.C. § 411(a)(3)(B) were complied with. See 362 F.2d at 894-895.[9] To arrive at this conclusion, the First Circuit reasoned that the individual members of a union ultimately bear the financial burden attributable to the assessment of a per capita tax upon their local by a superior labor organization because, but for that assessment, the dues that each individual member would have to pay to the local could be reduced by a corresponding amount. Thus, at least in situations where a labor organization contemplates imposing an additional per capita tax on a subordinate body after the latter has obtained an increase in the rates of dues payable by its members, adherence to the reasoning of Local 2 would require the submission of an ostensibly unitary lump sum dues increase to a two stage approval process under the relevant provisions of 29 U.S.C. § 411(a)(3).[10]
 
 
 16
 We believe that the reasoning leading to such a result would sweep within the ambit of 29 U.S.C. § 411(a)(3)(B) situations that Congress did not intend to place there. For instance, in the case before us, it is undisputed that the membership of Offshore Division approved the proposed increase in annual membership dues. As a result, each member became obligated to make yearly payments to the Offshore Division in the amount of $300 plus 6% of the member's annual vacation pay. Obviously, regardless of whether the IOMM&P chose to levy an increased per capita assessment on the Offshore Division, the dollar amount of the annual dues payable by members of that body would remain unaltered. Therefore, giving words their plain meaning, we endorse the conclusion of the court below that the IOMM&P's imposition of its additional per capita assessment on the Offshore Division "had no effect whatsoever upon the financial burdens of the individual members of the Offshore Division."
 
 
 17
 In conclusion, we think the result reached by the District Court strikes a proper balance between protecting the rights of union members and affording international unions some latitude to operate in their traditional spheres of interest. The fact that compliance with the relevant provisions of 29 U.S.C. § 411(a)(3) is a prerequisite for the imposition of any increase in the "rates of dues" payable directly by individual union members insures that such persons will retain a significant degree of control over the "cost" of their union membership. Should individual union members be dissatisfied with the uses to which their dues are put, rather than the amount of those dues, internal union political mechanisms provide adequate means, in most cases, for the expression and the redress of such grievances.[11]
 
 
 18
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 During the years in question the IOMM&P was composed of three subordinate bodies: the Offshore Division, the Inland Division, and the Pilots Division. However, the Offshore Division constituted the bulk of the total membership of the IOMM&P
 
 
 [2]
 The primary sources of income for both of these organizations were dues payments from existing members and initiation fees from new members. By 1973, employment opportunities for Offshore Division members were dwindling due to the decline of the American Merchant Marine. To assure sufficient work for its members, the IOMM&P closed its membership rolls, which of course drastically reduced initiation fee income. The resulting excess of retirements and withdrawals over new entries also reduced income from membership dues. In addition, to guard against rival maritime union "raids" on it membership, the IOMM&P affiliated with the larger and stronger International Longshoremen's Association, to which it became obligated to make per capita payments amounting to over $100,000 annually
 
 
 [3]
 Prior to the amendment, Article VIII, Section 1 of the IOMM&P Constitution read as follows:
 Commencing October 1, 1970, the financial officer of each subordinate body shall pay the International Secretary-Treasurer the following amount for each member in good standing of the subordinate body, each calender quarter:
 UNIT INTERNATIONAL
 DUES
Offshore Division $7.50
 * *
 * *
 * *
 The amendment proposed that this provision be changed to read as follows:
 Commencing January 1, 1974, the financial officer of each subordinate body shall pay the International Secretary-Treasurer the following minimum amount for each member in good standing of the subordinate body, each calendar quarter:
 UNIT INTERNATIONAL
 DUES
Offshore Division $7.50
 * *
 * *
 * *
 
 
 [4]
 The text of the proposed amendment to the Offshore Division By-Laws read as follows:
 "Resolved: To amend the Offshore Division By-Laws to provide for the following additional membership dues: Six (6%) percent of the gross amount of each vacation benefit received for work performed on any (IOMM&P) contracted vessel, and six (6%) percent of each vacation benefit received by every (IOMM& P) Offshore Division official.
 "The effective date shall be upon adoption."
 
 
 [5]
 The proposal to increase per capita taxes to 25% of Offshore Division membership dues received approval of the majority of delegates at the 1977 Convention, and the collection of these per capita taxes is not challenged on this appeal. Subsequently, in late 1977, the membership of the IOMM&P approved a new Constitution, which abolished all subordinate Divisions and made all dues payable directly to the IOMM&P
 
 
 [6]
 Subsection (A) of 29 U.S.C. § 411(a)(3) lists alternative procedures available to local labor organizations seeking authorization to increase membership dues; subsection (B) lists alternative procedures available to international labor organizations seeking authorization to increase membership dues
 
 
 [7]
 317 F.2d at 918 n.5
 
 
 [8]
 Although we agree with the reasoning expressed in this portion of the Ranes opinion, we note that the First Circuit's opinion in Local 2 correctly classified all discussion of per capita taxes in Ranes as dicta. See Local 2, supra, 362 F.2d at 894 & n.15
 The factual situation in Ranes involved action taken by an international union at a regular convention, concededly valid and authorized under 29 U.S.C. § 411(a)(3)(B), that had the effect of increasing the constitutional minimum for dues payable by members of affiliated locals. The membership of one of these subordinate bodies, Local 28, contended that such a dues increase had to be submitted for their approval, pursuant to the provisions of 29 U.S.C. § 411(a) (3)(A), before it could be implemented. In support of their position, the members of Local 28 argued that Congress intended the provisions of § 411(a)(3) (B) to apply whenever an international union sought an increase in a per capita tax assessment, but that whenever the dues of union members were increased, regardless of whether an international or a local union initiated such action, Congress intended the provisions of § 411(a)(3)(A) to govern. In this context, the Ranes court stated that § 411(a)(3)(B) did not apply to per capita taxes, a determination not necessary to be made to decide the Ranes case.
 
 
 [9]
 We consider the First Circuit's approach to be a curious one because implicit in the "financial burden test" is the assumption that "true" per capita taxes are not subject to the provisions of 29 U.S.C. § 411(a)(3)(B). Clearly, the court in King v. Randazzo would have engaged in a pointless intellectual exercise in devising a test to distinguish between "true" per capita taxes and disguised dues increases if it believed that the provisions of 29 U.S.C. § 411(a)(3)(B) would apply regardless of the distinction
 
 
 [10]
 It is unclear whether the reasoning of Local 2 would require compliance with 29 U.S.C. § 411(a)(3)(B) before an international could increase its per capita assessment when such action is not conditioned upon, and does not require, affiliated subordinate unions to obtain an increase in the rates of dues payable by their members. Nor is it clear whether the "but for" logic underlying the holding in Local 2 would require a local union to parse a proposed local union's dues increase into the constituent expenditure items for which the additional funds are destined, so that the individual union members may pass on every increment to the existing rates of dues, instead of being limited to an approval or rejection of the proposed dues increase on an aggregate basis
 
 
 [11]
 We recognize the possibility, alluded to at oral argument, than an international union might impose such an onerous increase in its per capita tax that the members of the subordinate locals would be coerced into increasing their own local membership dues so as to preserve the financial integrity of their locals. In such a situation, which is not presented here, it may well be desirable to depart from the general rule that compliance with 29 U.S.C. § 411(a)(3)(B) is not a prerequisite to increasing per capita taxes
 In passing, we note that such an abuse of an international's per capita taxing powers appears to have been involved in Local 2, supra. In addition to other suspicious circumstances present in that case, the members of Local 2 were required to make additional payments of approximately 79 cents per month, of which 75 cents had been earmarked for increased per capita taxes. See 362 F.2d at 892, n.1. As a result, "Local 2 found it necessary to vote another increase in its local membership dues." Id. at 895. Thus, although we disagree with the court's reasoning expressed in Local 2, we do not, given the peculiar facts in that case, disagree with the result there reached.