Benjamin R. **BURROUGHS**, William H. Gault and William T. Keane, Plaintiffs-Appellants,

v.

**OPERATING ENGINEERS LOCAL UNION NO. 3; Dale Marr; and Harold Huston, Defendants-Appellees.**

No. 81–4145.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1982.

Decided July 2, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 22, 1982.

Jeffrey G. Lewis, Oakland, Cal., for plaintiffs-appellants.

John J. Davis, Jr., McCarthy, Johnson & Miller, San Francisco, Cal., for defendants-appellees.

Before HAYNSWORTH,* and TRASK, Senior Circuit Judges, and WALLACE, Circuit Judge.

WALLACE, Circuit Judge:

Burroughs, Gault and Keane (the retired union members) appeal the entry of summary judgment for the Operating Engineers Local Union No. 3 (Local 3) and two of its officers. Their complaint alleged that Article VI of the by-laws of Local 3 permits increases in the "rates of dues" payable by the union members without a majority vote of the union membership, in violation of section 101(a)(3) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 411(a)(3). The complaint sought both preliminary and permanent injunctive relief restraining Local 3 from collecting any future dues increases pursuant to the by-laws absent the approval of a majority of the union membership voting by secret ballot. After initially denying

the retired union members' motion for a preliminary injunction and the parties' cross-motions for summary judgment, the district court granted a joint motion to reconsider its order denying summary judgment. The district court then granted a motion for summary judgment for Local 3 and the officers. We reverse and remand.

## I

Local 3 is a large labor organization with a membership of 32,000 working members and 5,000 retirees. It is the parent organization for six sublocals, each covering different kinds of work in separate industries. Appellants are all retired members of Local 3. Pursuant to Article VI, their dues have increased dramatically in recent years. For example, the dues paid by Burroughs have increased from $21.00 per quarter to $51.00 per quarter since his retirement in 1972, an increase of close to 150%. Expressed as a percentage of their monthly pensions, the increases in the dues paid by the retired union members have ranged from 68% to a high of 144%. The increases in the dues paid by active members of Local 3 pursuant to Article VI have also been substantial. The retired union members' evidence, largely unrebutted by Local 3, showed that for every job classification covered by Local 3's collective bargaining agreement, the dues paid by active union members have increased, both in absolute terms and as a percentage of compensation, since 1972. Although for certain years and certain job classifications there were slight decreases in dues as a percentage of earnings, the dues paid by active members have increased steadily since 1975.

Article VI of the by-laws was adopted by a majority vote of the union membership in 1964. The validity of the election adopting Article VI is not challenged in this appeal. Article VI provides[1] generally that for each

---

* Honorable Clement F. Haynsworth, Jr., Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

1. Article VI, § 2 of the by-laws provides in part:

(1) Subject to Section 3 of this Article, effective October 1, 1966, if the "total wage package" in the Master Agreement covering construction in Northern California has in-

$1.00 per day increase in the "total wage package" in the master collective bargaining agreement negotiated by Local 3 and the employers' association, "the quarterly dues rate ... shall be automatically increased by fifty cents ($0.50) per month." "Total wage package" is defined to include the hourly salary rate, plus all non-salary compensation paid or contributed by the employer, calculated for a straight-time shift. Article VI also provides[2]: that (1) Local 3's executive board may recommend that the automatic dues increase be "suspended for a temporary period, in whole or in part," and that any such recommendation shall be referred to the semi-annual meeting of the union membership for a vote; and (2) any temporary suspension in the automatic dues increase shall be deemed a permanent suspension to the extent it exceeds $5.00.

■ The retired union members have made consistent and concerted efforts to remove Article VI. For over 16 years they have protested dues increases imposed pursuant to Article VI and have asserted the illegality of the by-law under section 101(a)(3) through letters written to the ex-

creased by $1.00 per day, the quarterly dues rate ... shall be automatically increased by fifty cents ($0.50) per month.
(a) "Total wage package" means the hourly rate, plus health and welfare, pension, vacation-holiday pay, pay-in-lieu of vacation or holiday and pensioner's health and welfare payments, for a straight-time shift. The hourly rate used shall be the average of the top four (4) Group Wage Classifications.
. . . .
(c) For each $1.00 that the increase in the "total wage package" exceeds $1.00 per day, the automatic increase in the quarterly rate of dues shall be increased by fifty cents ($0.50) per month.

2. Article VI, § 3 of the by-laws, as amended an 1975, provides:
Prior to the Semi-Annual Meeting in July, the Executive Board shall review the financial condition and requirements of the Local Union, and shall make report thereon to the Semi-Annual meeting. If the Executive Board recommends that an automatic increase in dues as provided above should be suspended for a temporary period, in whole or in part, such recommendation shall be referred to the Semi-Annual Meeting for

ecutive board of Local 3. They have several times requested the executive board to submit the matter to a referendum of the union membership. Finally, nearly two months prior to the filing of the complaint in this case, they attempted to invoke the grievance procedure mechanisms of both Local 3 and the governing international union. Having received no positive response to any of their inquiries, they filed the complaint. Although Local 3 argues to the contrary, these considerations convince us that the district court did not abuse its discretion in refusing to stay the case pending exhaustion of internal union remedies by the retired union members. *See Winterberger v. General Teamsters Auto Truck Drivers Local 162*, 558 F.2d 923, 925 (9th Cir. 1977); *Buzzard v. Local 1040 Int'l Ass'n of Machinists*, 480 F.2d 35, 41–42 (9th Cir. 1973).

## II

The single dispositive question presented in this appeal is the proper definition of "rates of dues," as those words are used in section 101(a)(3).[3] The LMRDA does not

adoption, and the matter shall be determined accordingly.
Any annual automatic increase in dues that has been temporarily suspended that exceeds five dollars ($5.00) shall be deemed permanently suspended to the extent that said amount exceeds five dollars ($5.00).

3. Section 101(a)(3) of the LMRDA, 29 U.S.C. § 411(a)(3), provides:
Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on the date of enactment of this Act shall not be increased, and no general or special assessment shall be levied upon such members, except—
(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot . . . .
Neither section 101(a)(3) nor any other portion of the LMRDA specifically defines "rates of dues."

directly define this term. Local 3 argued, and the district court agreed, that the "rates of dues" paid by the union members had not increased as a matter of law, defining "rate of dues" to mean the formula by which an automatic increase in the "quarterly dues rate" is calculated under Article VI. The district court also agreed with Local 3's argument that the union officers' discretion to suspend any or all of the "automatic" increase did not violate section 101(a)(3) by depriving the union membership of its right to vote on increases in the rate of dues. The district judge was correct to the extent he held that if the "rate of dues" has not increased, there can be no violation of section 101(a)(3). *See DiMiceli v. National Marine Engineers Beneficial Ass'n*, 500 F.2d 31, 33 (9th Cir. 1974) (per curiam) (dictum). The statute requires a majority vote of the union membership only for increases in the "rates of dues"; conversely, all increases in the "rates of dues and initiation fees" must be approved by majority vote, and any by-law permitting such an increase without a vote is invalid on its face. LMRDA § 101(b), 29 U.S.C. § 411(b). But that is only a starting point.

■ The statute, the language of section 101(a)(3) and the legislative history of the LMRDA do not shed any direct light on what Congress intended the term "rate of dues" to mean. We therefore examine the congressional purpose underlying section 101, in particular the purpose motivating Congress's enactment of section 101(a)(3). Since our duty is to ascertain and apply the intent of Congress, we should interpret the language Congress has chosen to employ in the manner most consistent with the objective it was seeking to accomplish. *See, e.g., Adams v. Howerton*, 673 F.2d 1036, 1040 (9th Cir. 1982). Where, as here, Congress has failed to define its terms specifically, and the legislative history sheds no light on the question presented, our best approach is to construe the statutory language in accordance with its purpose. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). In this way, we properly limit ourselves, as much as we can, to interpreting and applying, rather than making, the law.

Section 101, as its title states, is a "bill of rights" for union members. Subject to such reasonable rules and regulations as may be prescribed in a union's constitution and by-laws, section 101 provides that every union member "shall have equal rights and privileges" to attend union meetings, vote and otherwise participate in union affairs; to meet and assemble freely with other union members and to express his or her own views pertaining to union elections or other union matters, whether at union meetings or otherwise; to institute legal action, whether or not against the union or its officers or members; and to petition any legislature or communicate with any legislator. It also guarantees each union member certain procedural protections in any disciplinary proceeding instituted by the union. LMRDA § 101(a)(1)–(5), 29 U.S.C. § 411(a)(1)–(5). The evident purpose of this bill of rights is to safeguard and preserve actual union democracy. Section 101 was "specifically designed to promote the 'full and active participation by the rank and file in the affairs of the union.'" *Hall v. Cole*, 412 U.S. 1, 7–8, 93 S.Ct. 1943, 1947, 36 L.Ed.2d 702 (1973), *quoting American Federation of Musicians v. Wittstein*, 379 U.S. 171, 182–83, 85 S.Ct. 300, 306, 13 L.Ed.2d 214 (1964). It was intended to protect the right of any union member to seek higher office within the union. *Id.* at 14, 85 S.Ct. at 1950. The guaranty of a democratic union organization provided by section 101 was designed to shield the union membership from arbitrary, autocratic, and despotic control by union officers and leaders. *See, e.g., Schuchardt v. Millwrights & Machinery Erectors Local 2834*, 380 F.2d 795, 797 (10th Cir. 1967); *Stout v. Construction & Gen. Laborers Dist. Council*, 226 F.Supp. 673, 678 (N.D.Ill.1963); *Green v. Local 705, Hotel & Restaurant Employees*, 220 F.Supp. 505, 506 (E.D.Mich.1963). As one court has stated:

> The Congress by passing a "Bill of Rights" for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too

great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy. Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values in the labor movement.

*Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir. 1967), *cert. denied,* 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968).

■ By requiring a majority vote of the union membership for any increase in the "rate of dues," section 101(a)(3) is a crucial ingredient in the amalgam of rights intended by Congress to promote real union democracy. The clear purpose of section 101(a)(3), therefore, is to curb the potential for autocratic and unrepresentative rule of union officers, *see Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1239 (2d Cir. 1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980), by preventing the leadership of a union from imposing arbitrary financial exactions unilaterally on its membership. *Mori v. International Bhd. of Boilermakers, Local 6,* 653 F.2d 1279, 1284 (9th Cir. 1981), *cert. denied,* 454 U.S. 1147, 102 S.Ct. 1011, 71 L.Ed.2d 301 (1982); *King v. Randazzo,* 346 F.2d 307, 309 (2d Cir. 1965). Section 101(a)(3) was designed to vest control over increases in rates of dues in the union members, not the union management. It is to this purpose which we must refer in construing the term "rate of dues."

The courts have not arrived at a generally accepted definition of "rate of dues."[4] At least three are possible. The first defines the term as an absolute amount. Under this definition, any by-law permitting an increase in the amount of dues paid by a union member, without a majority vote of the union membership, would be invalid. A second possible definition of rate of dues is as a percentage of union members' earnings. Under this definition, a by-law providing that dues are to be assessed as a constant percentage of members' monthly or quarterly compensation would legally permit the absolute amount of dues payable to rise periodically without requiring repeated votes of the union membership. Finally, Local 3 urges a third definition: that "rate of dues" means "an increase in amount which bears a fixed proportional relationship to increases in the 'total wage package.' " We have, however, been cited to no reported case adopting this definition. Indeed, it appears that the formula utilized in Article VI and proposed by Local 3 as the proper definition of "rate of dues" is actually the rate of *increase* of dues. In other words, given a pre-existing dues base, Article VI provides a formula for determining the marginal increase in dues commensurate with any increase in total daily employee compensation.

However, we need not here adopt any particular definition of "rate of dues." In a case strikingly similar to this one, *District Council of Painters 16 v. Painters Union Local 127,* 415 F.2d 1121 (9th Cir. 1969) (per curiam), *cert. denied,* 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970), we were presented with the question whether a by-law which coupled an automatic increase in dues, upon compensation raises negotiated by the union, with a provision granting union officers the discretion to waive all or part of the increase, violated section 101(a)(3). The district court in *Painters* rejected the proposition that a by-law could permit a constant or predetermined increase in dues as a percentage of earnings consistent with section 101(a)(3). "Congress intended that if a greater percentage

---

4. *Compare Painters Union Local 127 v. District Council of Painters 16,* 278 F.Supp. 830, 833 (N.D.Cal.1968), *aff'd,* 415 F.2d 1121 (9th Cir. 1969) (per curiam), *cert. denied,* 397 U.S. 972, 90 S.Ct. 1087, 25 L.Ed.2d 265 (1970), *with Seybert v. Lowen,* 623 F.2d 780, 783 (2d Cir. 1980); *Steib v. New Orleans Clerks & Checkers, Local 1497,* 436 F.2d 1101 (5th Cir. 1971) (per curiam); *Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties Carpenters Dist. Council,* 423 F.2d 515 (6th Cir. 1970); *Hummel v. Brennan,* 469 F.Supp. 1180, 1186 (E.D.Pa.1979); *Gates v. Dalton,* 441 F.Supp. 760 (E.D.N.Y. 1977); *and Schwartz v. Associated Musicians Local 802,* 237 F.Supp. 149 (S.D.N.Y.1963), *aff'd,* 340 F.2d 228 (2d Cir. 1964).

(and possibly amount) of a member's wages was to be taken from him after [the adoption of a by-law] than before, the procedural safeguards of [29 U.S.C.] § 411(a)(3) had to be observed to guarantee that the members genuinely desired such a result." 278 F.Supp. 830, 833 (N.D.Cal. 1968). Because the by-law in question was changed after the effective date of the LMRDA, the district court then addressed whether the by-law was an invalid "amendment" or a valid "readoption" of the rate increase provision. "To be able to find a readoption, the members would have to have been given the choice to vote to retain or discontinue the automatic increase provision, and not only to decide whether to grant the [union officers] the power to waive it." *Id.* at 834. Finding that the union membership had no opportunity to vote to discontinue the automatic increase provision, the district court held that the by-law was an invalid "amendment" and enjoined any future collection of dues pursuant to it.

We affirmed, based on the district court's reasoning. 415 F.2d at 1122. Judge Merrill concurred. He expressed the opinion that an automatic increase in dues, proportional to increases in negotiated pay raises, would not constitute an increase in the "rate of dues" within the meaning of section 101(a)(3). *Id.* (Merrill, J., concurring). However, he concluded that the provision of the by-law providing union management with the discretion to waive all or part of the "automatic" increase violated the statute. In his view, the by-law "in effect repealed the [automatic] rate and substituted for it the power in the [union management] to increase dues in any amount it might choose below a stated maximum. Such a method of providing for a dues increase constitutes a rate-fixing authority clearly contrary to the Act." *Id.*

We express no opinion on Judge Merrill's view of the legality of automatic increases proportional to pay raises. However, we largely agree with the latter part of his reasoning. Any definition of "rate of dues" must be consistent with the legisla-tive purpose to vest in the union membership, not the union management, control over increases in rates of dues. Congress clearly did not contemplate that a union membership could vote to increase its dues, either as an absolute amount or as a proportion of total earnings, and have the union's officers put the increase into effect at any time that they wanted to in the future. *See Brooks v. Local 30, United Slate, Tile & Composition Roofers,* 187 F.Supp. 365, 368 (E.D.Pa.1960). Yet that is precisely the effect of the by-laws involved in *Painters* and in this case. Each provides for a so-called "automatic" increase in dues, yet each permits union leadership to recommend the temporary or permanent suspension of all or part of the increase. Thus, the union officials are provided with nearly unfettered discretion to determine the size of any increase in dues. Rather than being an automatic increase, the by-law merely places a ceiling on the maximum increase permitted, leaving it to the union officers to determine if, and if so by how much, the increase should be smaller than that permitted. Thus, the union membership is never provided an opportunity to vote—yes or no—whether dues shall increase, either absolutely or as a percentage of earnings. If union management does nothing, dues increase pursuant to the rate of increase specified in the by-law. If management recommends that some of the increase be suspended, the membership can vote on whether to accept the smaller proposed increase or allow the maximum scheduled increase to occur. In only one situation, when the union officers vote to recommend that the *entire* automatic increase be suspended, is the union membership provided with a true choice of whether or not its rate of dues shall increase. Yet the record in this case does not demonstrate that the executive board of Local 3 has ever provided the union membership with such a meaningful vote by recommending that the entire automatic increase be suspended.

Local 3 argues that the provision added to Article VI granting union leadership the discretion to suspend all or part of

the increase is irrelevant to our decision because it merely permits union management to reduce the rate of dues, not to increase it. *See Schwartz v. Associated Musicians Local 802*, 237 F.Supp. 149, 155 (S.D.N.Y.1963), *aff'd*, 340 F.2d 228 (2d Cir. 1964). We reject such a technical construction of section 101(a)(3), in light of its evident purpose. By providing the executive board with unlimited discretion to determine whether it shall recommend total suspension of an increase in the "quarterly dues rate" which would otherwise take effect, the by-law deprives the union membership of its right to determine whether the rate of dues will increase at all. The union leadership may have the *discretion* to recommend a reduction in the automatic increase of dues prescribed by Article VI, but it has the *power* to determine, without submitting the matter to a vote of the union members, whether or not dues will increase. This is a result we believe Congress intended to prohibit when it enacted section 101(a)(3).

Nor is the problem answered by the simple response that the union membership has already exercised its democratic rights by adopting Article VI and has the power, as with any other by-law, to amend or delete it. This response, while plausible on the surface, overlooks the congressional purpose. Section 101 "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, —— U.S. ——, ——, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982). Because of abuses Congress perceived in union leadership's control of membership voting, Congress enacted section 101 to ensure by force of federal law that "unions would be democratically governed and responsive to the will of their memberships." *Id.*, at ——, 102 S.Ct. at 1870. Thus, section 101(a)(3) does not allow the union membership to abdicate its right to vote on increases in rates of dues by adopting a by-law which circumvents the congressional design. This would once more rest in the hands of union leaders the tools with which to abuse their power in the exact manner Congress sought to forbid. Any by-law violative of section

101(a)(3) is invalid on its face, whether or not the union membership retains the power to amend or abolish it by later vote.

We emphasize that we do not hold that any automatic increase in dues provided by a union by-law necessarily violates section 101(a)(3). That question will await another case. For example, by-laws providing for automatic adjustment of dues to counter the effects of inflation would present a different issue. To be truly automatic, however, it would seem that such increases would have to be governed solely by the union by-laws, validly adopted by the union membership, and not be subject to unilateral or near-unilateral modification by union officials. Nor do we, on the other hand, reach the question whether a validly adopted by-law providing for automatic increases in union dues necessarily violates section 101(a)(3) merely because it gives some adjustment discretion to union leadership. The test is whether its exercise of that discretion is subject to the control of the union membership. Where, as here, a by-law delegates control over increases in rates of dues essentially to the union officers and not the members, and deprives the membership of any meaningful ability to vote on whether the rate of dues shall increase as specified in the by-laws, as recommended by union management, or not at all, it violates section 101(a)(3).

The summary judgment entered in favor of Local 3 and the officers, based upon the conclusion that Article VI does not, as a matter of law, allow an increase in the "rate of dues," is reversed. The case is remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.