**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALEX CORNS,
            *Plaintiff-Appellant*,

            v.

LABORERS INTERNATIONAL UNION
OF NORTH AMERICA; NORTHERN
CALIFORNIA DISTRICT COUNCIL OF
LABORERS; HOD CARRIERS LOCAL
UNION 166, affiliated with the
Laborers International Union of
North America,
            *Defendants-Appellees*.

No. 11-15737

D.C. No.
3:09-cv-04403-
MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, Senior District Judge, Presiding

Argued and Submitted
July 20, 2012—San Francisco, California

Filed March 7, 2013

Before: Richard A. Paez and Jay S. Bybee, Circuit Judges,
and Sarah S. Vance, Chief District Judge.[*]

Opinion by Judge Paez;
Concurrence by Judge Bybee

## SUMMARY[**]

**Labor Law**

The panel affirmed in part and reversed in part the district court's summary judgment in a former union member's action under the Labor-Management Reporting and Disclosure Act, challenging an organizing fee and a dues increase imposed on local union members by the local's umbrella labor organizations even though the local's members did not approve these fees by a secret ballot vote, as provided in LMRDA § 101(a)(3)(A).

Affirming in part, the panel held that the plain text of the LMRDA authorizes a labor organization, other than a local labor organization or a federation of national or international labor organizations, to levy assessments or increase dues or initiation fees payable by its members by any of the procedures enumerated in LMRDA § 101(a)(3)(B), provided

---

[*] The Honorable Sarah S. Vance, Chief District Judge for the United States District Court for the Eastern District of Louisiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that union members' rights are adequately protected in the approval process. The panel held that the defendant international union complied with the LMRDA when it enacted an organizing fee, applicable to all of its members working in the construction industry, following a majority vote of its delegates at a national convention.

Reversing in part, the panel held that another defendant labor organization, which functioned as an intermediate body between the international union and a group of local unions, lacked the statutory authority to ratify a dues increase because the local union members were not members of that organization.

Concurring in the judgment, Judge Bybee wrote separately to express his differing views about the proper interpretation of LMRDA § 101(a)(3). He wrote that subsections (A) and (B) of § 101(a)(3) do not offer alternative methods for imposing levies, but rather offer the only lawful methods for imposing dues and fees payable by members of distinct types of labor organizations. Accordingly, levies payable only by members of a local union can only be lawfully approved under the procedures provided in subsection (A), requiring approval by a secret ballot vote of the local.

## COUNSEL

Christopher W. Katzenbach (argued), Katzenbach & Khtikian, San Francisco, California, for Plaintiff-Appellant.

Roberta D. Perkins (argued), Weinberg, Roger & Rosenfeld, Alameda, California, for Defendants-Appellees.

## OPINION

PAEZ, Circuit Judge:

Plaintiff Alex Corns, a now-retired member of Defendant Hod Carriers Local Union No. 166 ("Local 166"), filed this lawsuit under § 101(a)(3) of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(3), to challenge the legality of an organizing fee and a dues increase imposed on Local 166 members by the local union's umbrella labor organizations. Corns alleges that the labor organizations could not extract these fees without the approval of the Local 166 membership by a secret ballot vote, as provided in § 101(a)(3)(A). We hold that the plain text of the LMRDA authorizes a labor organization, other than a local labor organization or a federation of national or international labor organizations, to levy assessments or increase dues or initiation fees payable by its members by any of the procedures enumerated in § 101(a)(3)(B), provided that union members' rights are adequately protected in the approval process.

Because Defendant Laborers International Union of North America ("LIUNA") satisfied both prerequisites in this case, we conclude that it complied with the LMRDA when it

enacted an organizing fee, applicable to all of its members working in the construction industry, following a majority vote of its delegates at a general convention. With respect to the dues increase approved by Defendant Northern California District Council of Laborers ("NCDCL"), however, we conclude that the NCDCL lacked the statutory authority to ratify such an increase because Local 166 members are not, by the express terms of the International Union and Uniform District Council constitutions, members of the NCDCL. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

LIUNA is an international labor union that represents employees in the construction industry. The NCDCL functions as an intermediate body between LIUNA and fifteen Northern California local unions affiliated with LIUNA. Local 166, one of the local unions within the NCDCL's jurisdiction, represents masonry and plastering employees in Alameda, Contra Costa, San Francisco, and San Mateo counties.

## A.  The Union Hierarchy

We begin by describing the union hierarchy because our determination of the legality of the actions undertaken by LIUNA, the NCDCL, and Local 166 (collectively, "the Unions") requires an understanding of not only the Unions' organizational structure, but also the source and scope of their respective powers and obligations. LIUNA, which consists of the members of its affiliated local unions, derives its authority from the International Union Constitution. Int'l

Union Const. art. I, § 1.[1]  LIUNA's primary purpose is to protect and advance the welfare of its members by engaging in collective bargaining with employers; improving members' employment benefits and working conditions; implementing programs, practices, and policies to enhance members' employment opportunities; and participating in legal and legislative activities that serve to benefit the union membership. *Id.* art. II, § 1.  To that end, it is empowered to issue charters to subordinate bodies, including district councils and local unions; establish policies for and on behalf of itself and its subordinate bodies and members; and govern, discipline, and regulate its subordinate bodies. *Id.* art. II, § 2. Because LIUNA is the umbrella labor organization, all of its affiliated district councils and local unions are bound by its actions, and are obligated to comply with the Unions' respective constitutions, including the International Union Constitution, the Uniform District Council Constitution, and the Uniform Local Union Constitution. *Id.* art. XVII, § 4.

The NCDCL, a subordinate body created by LIUNA through a district council charter, "is charged with the responsibility to unify all of the economic and other forces of the affiliated Local Unions in its area, as a central representative body of such Local Unions."  Unif. Dist. Council Const. art. II, § 1.  Fifteen local unions in Northern California are affiliated with the NCDCL.  As provided in

---

[1] The parties filed excerpts of the Unions' respective constitutions in the district court.  Following oral argument, we requested that the parties file the full texts of the International Union Constitution, the Uniform District Council Constitution, and the Uniform Local Union Constitution.  We deem it appropriate to take judicial notice of these documents.  Fed. R. Evid. 201(b), (c)(1), (d); *see also United States v. Espinoza-Morales*, 621 F.3d 1141, 1150 (9th Cir. 2010) (taking judicial notice of documents submitted after oral argument).

Article XIX, § 5 of the International Union Constitution and Article I, § 2 and Article IV, § 1 of the Uniform District Council Constitution, the NCDCL's membership consists of delegates from its affiliated local unions.[2] To effectuate its purpose, the NCDCL possesses the constitutional authority "[t]o negotiate, bargain for and enter into understandings and agreements with employers, for and [on] behalf of its affiliated Local Unions and to enforce and police the observance thereof by employees and employers, Local Unions and their members . . . ." Unif. Dist. Council Const. art. II, § 2(d). The Uniform District Council Constitution also empowers the NCDCL to establish and regulate the amount of dues and initiation fees paid by members of its affiliated local unions. *Id.* art. II, § 2(e). To increase dues or fees, the NCDCL must convene a special convention at which delegates vote on whether an increase is necessary for one or more of the fifteen local unions. *Id.* art. VIII, § 2.

Local 166, an affiliate of LIUNA and the NCDCL, exists for the purpose of "gathering under one banner all those that work at the craft and calling of said International Union, in accordance with the craft and territorial jurisdiction allotted to each Local Union by its charter." Unif. Local Union Const. art. I, § 1. Pursuant to the Uniform Local Union Constitution, Local 166 is authorized to establish rules,

---

[2] The number of delegates from each local union is based, in part, on membership. Unif. Dist. Council Const. art. IV, § 3. The elected local union business manager is automatically a delegate to the NCDCL. Unif. Local Union Const. art. IV, § 4(E)(11), art. VI, § 4(b). Local unions may designate either the elected president or the elected secretary-treasurer as an additional delegate. *Id.* art. VI, § 4(b). Other delegates, if necessary, are elected by local union members as provided by the Uniform Local Union Constitution. *Id.* Local 166 is represented by two of the NCDCL's sixty delegates.

policies, and practices; collectively bargain with employers; and provide for the well-being and security of its members, officers, and employees through the establishment of insurance, health, and welfare benefit plans. *Id.* art. II, § 2. Local 166 is also empowered to raise income from dues, fees, and assessments payable by its members. *Id.* art. II, § 2(b). Like the Uniform District Council Constitution, the Uniform Local Union Constitution provides that dues and initiation fees shall be established and regulated by the NCDCL. *Id.* art. VIII, § 1. If, however, dues and initiation fees are not established by the district council, Local 166 is authorized to impose them by a secret ballot vote of the membership. *Id.* art. VIII, § 2.

## B. Local 166 Members' Dues and Fees Structure

Local 166 members' dues and fees are dictated by multiple collective bargaining agreements, some of which were negotiated by the NCDCL pursuant to its constitutional authority. When members work within San Francisco, San Mateo, Contra Costa, and Alameda counties, they work under collective bargaining agreements negotiated by their local union or the NCDCL ("the Local 166 Agreements"), or under collective bargaining agreements negotiated by Hod Carriers Local Union No. 36 ("Local 36").[3]  Otherwise, they may work under collective bargaining agreements negotiated by

---

[3] At some point between March and May 2008, LIUNA's international president transferred the former members of Local 36, who had previously merged with Laborers Local Union No. 270, to Local 166. Local 36's former members continued to work under collective bargaining agreements that remained in effect following the merger of the two local unions.

the NCDCL on behalf of multiple local unions in various Northern California counties.

Local 166 members' wages and dues rates vary depending on the applicable collective bargaining agreement. Generally, however, members pay union dues consisting of regular dues (sometimes referred to as "counter dues") in a fixed monthly amount; working dues (sometimes referred to as "dues check-off" or "supplemental dues") in an amount that corresponds with the hours each member works; and organizing fees in an amount that varies depending on the location of the work and the governing collective bargaining agreement. Individual employers withhold these dues and fees from Local 166 members' wages and, depending on the agreement, the deductions are remitted to either Local 166's Trust Funds or the NCDCL's Trust Fund.

## C. LIUNA Organizing Fee

Corns challenges the organizing fee approved at LIUNA's 2006 general convention. During the convention, LIUNA's delegates ratified Resolution 12, which required, among other things, that every affiliated local union involved in the construction industry pay $0.25 per hour, to be phased in over the ensuing three years, to a regional organizing fund for all hours worked by its members in construction. The regional organizing funds were intended to finance activities designed to increase LIUNA's membership.

In accordance with Resolution 12, the LIUNA organizing fee was incorporated into some of the collective bargaining agreements covering Local 166 members. Thus, although Local 166 members had not previously incurred an organizing fee for work performed in San Francisco and San

Mateo counties, the 2008–10 San Francisco and San Mateo Masonry Agreement included an organizing fee of $0.16 per hour and the 2008–10 San Francisco and San Mateo Plastering Agreement included an organizing fee of $0.25 per hour.

Under three separate collective bargaining agreements covering work performed in Alameda and Contra Costa counties, Local 166 members paid separate fees used to fund Local 166 organizing efforts.  Specifically, under the 2005–07 Alameda and Contra Costa Masonry Agreements, members paid an organizing fee of $0.60 per hour for work performed under these agreements.  Meanwhile, the 2005–07 Alameda and Contra Costa Plastering Agreement provided for an organizing fee of $1.10 per hour for work performed under this agreement.  The organizing fees were carried over into the renegotiated 2008–10 Alameda and Contra Costa Plastering and Masonry Agreements.

**D.  The NCDCL Dues Increase**

Corns also challenges dues increases included in the 2008–10 Local 166 Agreements, which included the San Francisco and San Mateo Masonry Agreement, the San Francisco and San Mateo Plastering Agreement, the Alameda and Contra Costa Masonry Agreement, the Alameda and Contra Costa Commercial Plastering Agreement, and the Alameda and Contra Costa Residential Plastering Agreement. At a general meeting held on June 20, 2008, the NCDCL approved the 2008–10 Agreements, all of which included wage and dues increases.  The agreements went into effect on July 1, 2008.

After receiving notice of the increases, Corns wrote LIUNA's general president to express his concern about the imposition of a dues increase absent a secret ballot vote of the local membership. The following day, the NCDCL's executive board proposed that a special convention be held on September 19, 2008 to consider the dues increase included in the 2008–10 Local 166 Agreements. The proposal was presented to and approved by the NCDCL's general delegates at a meeting held on that same date.

Although the 2008–10 Local 166 Agreements had already been ratified by the NCDCL, the agreements were presented to Local 166 members at a general board meeting on June 26, 2008. Corns objected, requesting that a standing vote count of the membership be taken to approve the new agreements. A majority of Local 166 members voted in favor of the 2008–10 Local 166 Agreements by a standing vote.[4]

On August 8, 2008, the NCDCL provided notice of the special convention to its delegates. At the special convention held on September 19, 2008, the NCDCL's delegates, including two Local 166 representatives, voted unanimously

---

[4] Local 166's sergeant-at-arms conducted the standing vote, which resulted in thirty votes in favor of the 2008–10 Local 166 Agreements and twenty-nine votes against. Corns challenged the vote on the ground that the sergeant-at-arms was the son of Local 166's business manager. At the business manager's request, the NCDCL's assistant business manager requested the approval of the membership to take another standing vote count. Following the membership's approval of his request, the membership also approved a request to permit an NCDCL executive board member to take the count with the NCDCL's assistant business manager. The second standing vote resulted in thirty-six votes in favor of, and thirty votes opposed to, the 2008–10 Local 166 Agreements.

to approve the dues increase included in the 2008–10 Local 166 Agreements.

Corns wrote a letter to LIUNA objecting to the increases approved at the NCDCL special convention. LIUNA's general president responded to Corns on March 13, 2009, explaining that LIUNA took the position that Local 166's dues were properly increased in accordance with the Uniform District Council and Uniform Local Union constitutions.

## E. Procedural Background

Corns then filed this lawsuit, seeking damages for the increased dues and organizing fees deducted from his wages as a member of Local 166, a declaration prohibiting the NCDCL from exercising its power to impose dues increases in accordance with the Uniform District Council and Uniform Local Union constitutions, and injunctive relief. The parties filed cross-motions for summary judgment. In denying Corns's motion for partial summary judgment and granting the Unions' motion, the district court concluded that § 101(a)(3) of the LMRDA provides alternative methods for levying assessments and increasing dues, and requires a secret ballot vote of the local membership only when a local labor organization imposes an assessment or dues increase. Because LIUNA and the NCDCL are not local labor organizations, the district court concluded that they validly approved the organizing fee and the dues increase following a majority vote of their delegates at a regular convention and a special convention, respectively, in accordance with § 101(a)(3)(B)(i).

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.* We draw all reasonable inferences in the light most favorable to the moving party, but "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## III. DISCUSSION

The LMRDA "was the product of congressional concern with widespread abuses of power by union membership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982). Although the initial "legislation focused on disclosure requirements and the regulation of union trusteeships and elections," Congress subsequently adopted numerous amendments "all aimed at enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution." *Id.* The amendments created a statutory "Bill of Rights" "specifically designed to promote the 'full and active participation by the rank and file in the affairs of the union.'" *Hall v. Cole*, 412 U.S. 1, 7–8 (1973) (quoting *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 182–83 (1964)). Title I of the LMRDA, which reflects the amendments, granted a panoply of rights to union members, including the right to vote and participate in a union's decision-making process, freedom of speech and assembly, and procedural safeguards in

disciplinary actions.[5]  29 U.S.C. § 411(a); *see also Local 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 536–37 (1984).  "In providing such protection, Congress sought to further the basic objective of the LMRDA: 'ensuring that unions [are] democratically governed and responsive to the will of their memberships.'"  *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 352 (1989) (quoting *Finnegan*, 456 U.S. at 436 (alteration in original)).

## A.  Section 101(a)(3) of the LMRDA

The issues raised here primarily concern § 101(a)(3), a rarely invoked provision of Title I of the LMRDA, governing the imposition of dues, initiation fees, and assessments by labor organizations.[6]  We have previously recognized that the

---

[5] The LMRDA also includes a private right of action authorizing any aggrieved person to bring a civil action in a district court of the United States for any violation of the Act.  29 U.S.C. § 412.

[6] Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization . . . shall not be increased, and no general or special assessment shall be levied upon such members, except –

> (A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

> (B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a

purpose of § 101(a)(3) "is to curb the potential for autocratic and unrepresentative rule of union officers by preventing the leadership of a union from imposing arbitrary financial extractions unilaterally on its membership." *Burroughs v. Operating Eng'rs Local Union No. 3*, 686 F.2d 723, 728 (9th Cir. 1982) (internal citation omitted).

Because the parties dispute whether § 101(a)(3)(A) or (B) applies in this case, we must address the threshold issue of statutory construction. In interpreting the meaning of § 101(a)(3), we first consider the plain text of the statute. *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011). In doing so, "[w]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* at 847–48 (quoting *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999)).

As the introductory paragraph explains, § 101(a)(3) does not apply to a federation of national or international labor organizations. 29 U.S.C. § 411(a)(3). All other labor

---

special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization, pursuant to express authority contained in the constitution and bylaws of such labor organization . . . .

29 U.S.C. § 411(a)(3).

organizations,[7] however, must abide by § 101(a)(3)'s requirements prior to increasing dues or initiation fees or levying assessments.  In light of the provision's parallel references to "members" in the clause regarding increases in rates of dues and initiation fees, on the one hand, and the clause regarding the levying of general or special assessments, on the other hand, we conclude that § 101(a)(3) mandates that a labor organization shall only impose such financial extractions on its own members, as that term is defined in the LMRDA.[8]  *Id.*

Subsection (A) provides that when a *local* labor organization seeks to increase dues or initiation fees or levy assessments, it must first obtain the approval of the majority of its members in good standing.  *Id.* § 411(a)(3)(A).  This

---

[7] The LMRDA defines a "labor organization" as "a labor organization engaged in an industry affecting commerce and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization, other than a State or local central body."  *Id*. § 402(i).

[8] Under the LMRDA, a "'[m]ember' or 'member in good standing', when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization."  *Id*. § 402(o).

approval always necessitates a secret ballot[9] vote of the local membership, at either a general or special membership meeting or in a membership referendum. *Id.* By requiring a secret ballot vote in both instances, § 101(a)(3) serves the dual purpose of protecting members' right to participate in their local union's decision-making processes while simultaneously ensuring that they will not be subjected to unjust discrimination on account of how they cast their ballot. *See Finnegan*, 456 U.S. at 435–36 (explaining that the statutory "Bill of Rights" "placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union, which in many instances could mean loss of union membership and in turn loss of livelihood.").

Subsection (B), meanwhile, applies to dues or initiation fees increases or assessments imposed on members of a labor organization, "*other than a local labor organization or a federation of national or international labor organizations*." 29 U.S.C. § 411(a)(3)(B) (emphasis added). Under subsection (B), labor organizations, such as international unions, are authorized to increase dues or initiation fees or levy assessments by one of several methods, including by a majority vote of delegates at a regular or special convention. *Id.* This, too, comports with the objectives of the LMRDA, which we have concluded was not intended to infringe international unions' traditional authority to establish local unions' rates of dues. *See Mori v. Int'l Bhd. of Boilermakers, Local 6*, 653 F.2d 1279, 1283 (9th Cir. 1981). In this way,

---

[9] A "secret ballot" is defined as "the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." *Id.* § 402(k).

the LMRDA balances umbrella labor organizations' interest in self-governance with union members' right to participate in the decision-making process through elected representatives. *Crowley*, 467 U.S. at 539 (noting that Congress meant to further the LMRDA's basic policy of promoting democratic union governance "with a minimum of interference in the internal affairs of unions.").

Reading these provisions together, and taking into account the LMRDA's objectives and policy, we conclude that subsections (A) and (B) provide alternative methods for increasing dues or initiation fees or levying assessments. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (explaining that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). In particular, we note Congress' use of the word "or" to separate the two subsections, which we interpret as taking its "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). "In its elementary sense, the word 'or,' as used in a statute, is a disjunctive particle indicating that the various members of the sentence are to be taken separately." 73 Am. Jur. 2d Statutes § 147 (2012).[10]

Although we conclude that the plain text of the LMRDA controls our analysis, we also find support for our interpretation in the existing case law. In *Ranes v. Office*

---

[10] The concurrence suggests an interpretation of the statute that does not account for its plain text, particularly the word "or" that connects 29 U.S.C. §§ 411(a)(3)(A) and (B). We place considerable importance on the precise text of the statute, and therefore do not find the concurrence's interpretation of the statute to be persuasive.

*Employees International Union, Local No. 28*, for example, the plaintiffs argued that a local union could not increase dues in accordance with the international union's constitutional amendment raising the minimum dues requirement without a secret ballot vote of the local membership. 317 F.2d 915, 916 (7th Cir. 1963). The Seventh Circuit held that the international union complied with the LMRDA when it increased the constitutional minimum for dues payable by its members to their respective local unions following the approval of the increase by a majority of delegates voting at its regular convention. *Id.* at 916–17. The Seventh Circuit observed that, although a local union must obtain a majority vote of its members under subsection (A), "subsection (B) prescribes *alternative* methods by which an international union may increase 'rates of dues.'" *Id.* at 917 (emphasis added). In so concluding, the court explained:

> The legislative history of the Act is silent on this question, but we think it clear that [§] 101(a)(3) embodies congressional recognition of the existence of a sphere of interest in both international and local unions in the area of membership dues. Traditionally, international unions have exercised primary jurisdiction over affairs of their affiliated local unions, including the control of the local dues structure sufficient to insure the financial health of the union structure. Many international unions exercise control in the latter sphere of interest by the device of prescribing the minimum rate for the dues which each of their locals shall collect from its members. We cannot assume that Congress was unaware of the traditional

structure and dues practices of labor unions when it enacted [§] 101(a)(3), or that Congress, being aware of the traditional structure and practices, intended by enacting that Section to strip international unions of their traditional power to control the minima and maxima of rates of dues without one word in the Committee Reports expressing that intention. On the contrary, we must assume that Congress was aware of the established structure and practices and interpret the statute in the light thereof.

*Id.* at 917–18 (footnotes omitted). Recognizing that the purpose of § 101(a)(3) is to protect union members' rights, the Seventh Circuit further concluded that members' rights are adequately protected when they "have representation at the council table where dues structures are changed." *Id.* at 918.

Relying in part on the reasoning in *Ranes*, we held that the LMRDA authorized an international union to increase the dues imposed on field construction members in its affiliated local unions by approving the dues structure by a majority of delegates voting at a convention of the international union. *Mori*, 653 F.2d at 1285. We found support for the Seventh Circuit's approach in a subsequently decided Supreme Court case, in which the Court concluded that the LMRDA was not intended to disrupt the established union practice of weighted voting. *Id.* at 1283 (quoting *Wittstein*, 379 U.S. at 178). As a result, we adopted the Seventh Circuit's interpretation of the LMRDA and endorsed "two considerations supportive of an international's power to establish minimum local dues: legislative intent [to preserve international unions' traditional

authority to establish rates of dues] and adequate protection of union members' rights." *Id.*

With respect to the first consideration, we agreed that Congress did not intend to curb international unions' traditional power to establish local unions' rates of dues. *Id.* at 1284. Addressing the second consideration, we noted "the participation of delegates representing plaintiffs ensured their rights under [§] 101(a)(3)(B)," and concluded that "there [was] no reason in this case to distrust the democratic process at work at the convention." *Id.* at 1285. Although the dues increase applied to only "a minority within the international," *id.* at 1284, we concluded that the international union's efforts did "not reflect an attempt on the part of a majority of the international to exploit or discriminate against the minority of construction workers," *id.* at 1285. "Instead, the convention's action appear[ed] to reflect the judgment of the majority concerning the measures necessary to enhance the vitality of the construction lodges." *Id.* We also found it significant that the funds collected under the new dues structures would "be retained by the local construction lodges for their own benefit." *Id.* at 1284.

In light of the plain text of the statute and the LMRDA's purposes, we hold that § 101(a)(3)(A) and (B) establish alternative methods by which labor organizations are authorized to increase dues or initiation fees or to levy assessments on their members, subject to the explicit restrictions in the statute. In other words, the LMRDA requires that, prior to increasing dues or initiation fees or levying assessments, a local union must always obtain the majority approval of its members in good standing by a secret ballot vote. 29 U.S.C. § 411(a)(3)(A). The statute, however, concurrently permits any other labor organization, except for

the excluded categories set forth in the provision, to impose an identical dues or fees increase or assessment by *any* of the methods provided in § 101(a)(3)(B), including by majority delegate approval at a general or special convention. *Id.* § 411(a)(3)(B); *see also Mori*, 653 F.2d at 1285 (permitting an international union to impose a dues increase payable by local union members to their respective local unions). And, as explained in *Mori*, any exercise of authority under § 103(a)(3) must adequately protect members' rights.[11] *Id.* By creating alternative methods, the LMRDA balances the twin goals of protecting union democracy and preserving union self-governance. *See* Marcia Greenblatt, Note, *Union Officials and the Labor Bill of Rights*, 57 Fordham L. Rev. 601, 601–02 (1989) (explaining that Congress "did not intend the LMRDA to prevent the unions from maintaining reasonable rules for self-governance, and therefore tempered the goal to democratize the unions with a policy to avoid excessive interference into intra-union government." (footnote omitted)). Thus, having established the statutory framework within which this case must be analyzed, we turn to the particular financial extractions at issue.

---

[11] The concurrence overlooks this critical aspect of our analysis. Union members pay fees and dues, but they receive the benefit of collective power and representation. And, contrary to the concurrence's assertion, the stated purpose of the LMRDA is not "to protect union members against increases in dues and fees." Rather, the purpose of the LMRDA is to ensure that unions are democratically governed. The purpose of § 103(a)(3), in particular, is to protect union members from arbitrary or unilateral extractions which, by their very nature, are not democratically approved. There is nothing in our analysis which would permit a labor organization to bypass member participation, through either a direct vote or a representative vote, when increasing members' dues and fees.

## B. The LIUNA Organizing Fee

Resolution 12, which was adopted by a majority of LIUNA's delegates voting at a regular convention, provided, in relevant part, "that every Local Union having jurisdiction in the construction industry shall pay $.25 per hour, to be phased in over three years[.]"  Corns argues that LIUNA violated § 101(a)(3)(A) of the LMRDA by approving Resolution 12 without a secret ballot vote of the local unions' membership.  We disagree.

Because LIUNA is an international union, its approval of Resolution 12 is governed by subsection (B), not subsection (A), of § 101(a)(3) of the LMRDA.  As explained above, the LMRDA authorizes an international union to increase dues or initiation fees or levy an assessment payable by its members provided that it satisfies § 101(a)(3)(B)'s requirements and it adequately protects the rights of union members in the approval process.  29 U.S.C. § 411(a)(3)(B); *see also Mori*, 653 F.2d at 1285.  There is no dispute that, under Article I, § 1 of the International Union Constitution, the members of LIUNA's affiliated local unions are also members of the international union.    Therefore, LIUNA is statutorily empowered to impose financial obligations on local union members.  The international union also complied with the LMRDA by adopting Resolution 12 by one of the procedures explicitly authorized under § 101(a)(3)(B)—approval by a majority of LIUNA's delegates voting at a regular convention.  29 U.S.C. § 411(a)(3)(B)(i).  And, notably, Corns does not assert that any procedural irregularity occurred, or that union members' rights were not adequately protected in the voting process.  *See Mori*, 653 F.2d at 1284–85.

Although the organizing fees are not retained by local unions, as they were in *Mori*, the funds are used to increase union membership in the district councils' regional jurisdictions. Such efforts directly benefit LIUNA's affiliated local unions by adding new members to their ranks. Thus, we conclude that LIUNA satisfied the LMRDA's requirements when it adopted the $0.25 per hour organizing fee following the approval of Resolution 12 by a majority of its delegates voting at a general convention.

Corns further argues that even if the adoption of Resolution 12 did not contravene the LMRDA's requirements, the implementation of the organizing fee was nonetheless deficient in several respects. First, Corns argues that the organizing fees included in the 2008–10 Local 166 Agreements exceeded the amount authorized by Resolution 12. The organizing fees added to the 2008–10 San Francisco and San Mateo Masonry and Plastering Agreements, $0.16 and $0.25 per hour, respectively, are plainly within the maximum rate authorized by Resolution 12. The organizing fees provided for in the 2008–10 Alameda and Contra Costa Masonry and Plastering Agreements, $0.60 and $1.10 per hour, respectively, similarly do not exceed the $0.25 per hour organizing fee approved by LIUNA because they represent independent financial obligations imposed by Local 166. Organizing fees in identical amounts were deducted from Local 166 members' wages under the 2005–07 Alameda and Contra Costa Agreements. Because there was no *increase* from the 2005–07 Alameda and Contra Costa Agreements, the organizing fees included in the 2008–10 Alameda and Contra Costa Agreements do not exceed the amount approved at LIUNA's general convention. Rather, the $0.60 and $1.10 organizing fees are properly characterized as preexisting financial obligations imposed by Local 166 on its own

members to fund Local 166—not regional—organizing efforts.

Next, Corns argues that the district court erred in granting summary judgment with respect to the validity of the organizing fees provided for in the Alameda and Contra Costa Agreements because a factual dispute remains as to whether there was ever a valid secret ballot vote to approve these fees. Stated differently, Corns argues that, absent evidence of a prior secret ballot vote of Local 166 members, the inclusion of the organizing fees in the 2008–10 Alameda and Contra Costa Agreements constituted a continuing violation of the LMRDA. We conclude that Corns waived this argument by failing to raise it in the district court, and we accordingly decline to address it. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

Third, Corns argues that Resolution 12 requires that local unions—not their members—pay the organizing fees. Under the "financial burden" test, "[w]hether there has been an increase in dues must be determined not by who imposed the exaction but by the nature of the imposition and its direct effect upon the financial burden of the individual members." *King v. Randazzo*, 234 F. Supp. 388, 394 (E.D.N.Y. 1964); *see also Patterson v. United Bhd. of Carpenters*, 906 F.2d 510, 513 (10th Cir. 1990) (indicating that several circuits have approved the "financial burden" test). Unlike a dues increase,

> [a] true "per capita tax" is one which is levied by a parent labor organization upon a local union with which it is affiliated. It is not a tax levied by a parent or a coordinating union directly upon the members of its affiliated

> locals.   It is paid to the parent body or
> authorized coordinating union from the dues
> collected by the local from its members and
> generally related to the numerical strength of
> the local.   But it is not an additional sum
> charged directly to the member and it is not
> used as a subterfuge to increase dues.

*King*, 234 F. Supp. at 394.   In *King*, the district council explicitly referred to the payment as a "per capita tax" in the applicable constitutional provision.   *Id.* at 390.   Applying the "financial burden" test, the district court in *King* nonetheless concluded that the "[t]he term 'per capita tax' as used in this case [was] not used in its traditional sense" but rather was "employed to denote the payment of dues by members of a local directly to an intermediate coordinating council within the [local union] structure."   *Id.* at 394.

We recognize that the "financial burden" test was formulated to prevent labor organizations from circumventing the LMRDA's requirements by classifying a financial obligation as a per capita tax, which is not governed by the LMRDA, when, in reality, it functions as a dues increase on union members, which triggers § 101(a)(3)'s requirements. *Seybert v. Lowen*, 623 F.2d 780, 784 (2d Cir. 1980) (explaining that the "financial burden" test was intended to distinguish "'true' per capita taxes from devices that, although labeled as 'per capita taxes,' actually were disguised dues increases which labor organizations sought to impose on their members without the necessity of first complying with the procedures mandated by 29 U.S.C. [§] 411(a)(3)"); *Ranes*, 317 F.2d at 918.   In adopting Resolution 12, however, LIUNA complied with the LMRDA's requirements and there is consequently no evidence that it sought to undermine the

democratic processes protected by the statute. Thus, there is no basis for interfering with LIUNA's implementation of a properly enacted organizing fee. *Teamsters Joint Council No. 42 v. Int'l Bhd. of Teamsters*, 82 F.3d 303, 306 (9th Cir. 1996) (acknowledging the "well-established federal policy of avoiding unnecessary interference in the internal affairs of unions" and cautioning courts that, absent evidence of bad faith or special circumstances, they "must be careful not to undermine union self-government"); *Reich v. Local 89, Laborers' Int'l Union of N. Am.*, 36 F.3d 1470, 1476 (9th Cir. 1994) (noting the countervailing policy of the LMRDA that "unions should be free to conduct their affairs so far as possible and the government should not become excessively involved in union politics").

Finally, Corns contends that the district court erred in granting the Unions' motion for summary judgment because the record does not demonstrate that the organizing fees collected under Resolution 12 were paid, in full, to the NCDCL's regional organizing fund, as opposed to Local 166. Having reviewed the record, we conclude that Corns provided insufficient evidence to demonstrate that a genuine issue of material fact exists as to whether the organizing fees are remitted in their entirety to the NCDCL's regional organizing fund.

Accordingly, we conclude that LIUNA complied with the LMRDA when it enacted an organizing fee payable by local union members by approving the fee by a majority of its delegates voting at a general convention. Because LIUNA properly implemented the organizing fee, the district court did not err in rejecting Corns's challenge to the collection of this fee.

## C.  The NCDCL Dues Increase

Corns also contends that the NCDCL lacked the statutory authority to increase Local 166 members' dues by a majority delegate vote at a special convention.  According to Corns, the NCDCL is only permitted to increase the dues of its own members, who, in this case, consist of the district council's fifteen affiliated local unions or the delegates from these local unions.  The Unions, on the other hand, assert that the Uniform District Council and Uniform Local Union constitutions, which are binding on Local 166 members, empower the NCDCL to impose dues increases on members of affiliated local unions.  In light of the plain text of the International Union Constitution and the Uniform District Council constitutions, we conclude that the NCDCL violated the LMRDA when it imposed a dues increase on Local 166 members.

To properly impose a dues increase, the NCDCL, which is not a local labor organization, must comply with the requirements set forth in § 101(a)(3)(B) of the LMRDA. 29 U.S.C. § 411(a)(3)(B).  The statute only permits a labor organization to impose a financial extraction, such as a dues increase, on its own members. *Id.* § 411(a)(3).  As explained above, under the LMRDA, a "member" "when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization."  *Id.* § 402(o).  We therefore look to the NCDCL's constitution and bylaws to determine who is a member of the labor organization.

The International Union and Uniform District Council constitutions explicitly define the membership of district councils, such as the NCDCL, as the delegates from affiliated local unions, who have been elected in the manner and number provided for in the Uniform District Council Constitution. Int'l Union Const. art. XIX, § 5; Unif. Dist. Council Const. art I, § 2, art. IV, § 1. Yet, the Unions urge us to adopt the district court's reasoning that Local 166 members are in substance members of the NCDCL because they are bound by the constitution and bylaws of all of the labor organizations in the union hierarchy. They argue that Local 166 members are effectively members of the NCDCL because they are bound by the terms of the Uniform Local Union Constitution, which in turn obligates members of Local 166 to abide by the International Union and Uniform District Council constitutions. Because Article II, § 2(e) and Article VIII, § 2 of the Uniform District Council Constitution and Article VIII, § 1 of the Uniform Local Union Constitution delegate the authority to establish and regulate dues and initiation fees to the NCDCL, the Unions contend that the NCDCL is authorized to impose dues increases payable by members of local unions.

Although we remain mindful of "the well-established federal policy of avoiding unnecessary interference in the internal affairs of unions and according considerable deference to the interpretation and application of a union's rules and regulations," *Sergeant v. Inlandboatmen's Union of the Pac.*, 346 F.3d 1196, 1200 (9th Cir. 2003), we cannot adopt a position that so plainly conflicts with the express language of the constitutional provisions defining the NCDCL's membership. *Cf. Motion Picture & Videotape Editors Guild, Local 776 v. Int'l Sound Technicians, Local 695*, 800 F.2d 973, 976 (9th Cir. 1986) ("Absent a specific

limitation in a union constitution, this court will not interfere with the efforts of a union's leaders to manage the affairs of their organization."). In addition to the provision addressing the composition of the NCDCL, we also note that the membership qualifications and obligations delineated in the Uniform District Council Constitution, which are relevant under the LMRDA for purposes of defining a labor organization's membership, apply to union delegates, not individual union members.[12] Unif. Dist. Council Const. art. IV, §§ 3–4. We also find it significant that the International Union Constitution expressly provides that the members of LIUNA consist of the members of its affiliated local unions. Int'l Union Const. art. I, § 1.

In so concluding, we agree with the Unions that Local 166 members must conform and comply with all of the Unions' constitutions. *See Imel v. Zohn Mfg. Co.*, 481 F.2d 181, 183 (10th Cir. 1973) (concluding that local union members are bound by the constitutions and bylaws of the local union's umbrella organization). But, the mere fact that Local 166 members are bound by the constitutions and bylaws of all of the labor organizations in the Unions' hierarchy is not sufficient to bring them within the definition of "member" for purposes of the LMRDA. In light of these considerations, we reject the Unions' circuitous approach of defining the NCDCL's membership by cobbling together other constitutional provisions concerning the NCDCL's powers and the obligations of its affiliated unions. Instead, we rely on the express provisions in the International Union

---

[12] For this reason, we disagree with Corns's characterization that the affiliated local unions are the members of the NCDCL for purposes of the LMRDA.

and Uniform District Council constitutions defining membership.

We do not speculate whether the NCDCL, if it were to amend its constitution, could impose a dues increase on the members of only one of its affiliated local unions. We hold only that, although we generally accord deference to a labor organization's interpretation of its own policies and provisions, there is no justification for an interpretation that squarely conflicts with the plain text of its constitutions and bylaws. We therefore conclude that the NCDCL violated § 101(a)(3) of the LMRDA when it imposed a dues increase on Local 166 members.

## IV.  CONCLUSION

In light of the plain text of § 101(a)(3)(B) and our holding in *Mori*, we conclude that LIUNA complied with the LMRDA when it approved an organizing fee payable by Local 166 members by a majority vote of its delegates at a general convention. We further conclude that the NCDCL lacked the statutory authority to impose a dues increase on Local 166 members because they are not also members of the NCDCL. Accordingly, the district court's grant of summary judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**AFFIRMED in part; REVERSED in part; and REMANDED**. Each side shall bear their own costs on appeal.

BYBEE, Circuit Judge, concurring in the judgment:

Although I concur in the judgment, I write separately to express my differing views about the proper interpretation of § 101(a)(3) of the Labor-Management Reporting and Disclosure Act ("LMRDA" or "Act"), 29 U.S.C. § 411(a)(3).[1]

---

[1] The full text of § 101(a)(3) reads as follows:

Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except–

(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; or

(B) in the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations, (i) by majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice, or (ii) by majority vote of the members in good standing of such labor organization voting in a membership referendum conducted by secret ballot, or (iii) by majority vote of the members of the executive board or similar governing body of such labor organization,

The majority concludes that subsections (A) and (B) of § 101(a)(3) "provide alternative methods for increasing dues or initiation fees or levying assessments" payable by members of a local labor organization. Maj. Op. at 18–22. The majority acknowledges that this interpretation leaves open the possibility that it is lawful under the LMRDA for a larger umbrella labor organization to levy dues and fees on the members of a local union—and that union alone—through procedures that do not involve a vote of the local union's members. Maj. Op. at 31. The majority claims, however, that because the dues increase imposed only on the members of Hod Carriers Local Union No. 166 ("Local 166") by the delegates to the Northern California District Council of Laborers ("NCDCL")—an umbrella labor organization that represents Local 166 and other local labor organizations—was unlawful under the NCDCL constitution, there is no need to "speculate whether the NCDCL, if it were to amend its constitution, could impose a dues increase on the members of only one of its affiliated local unions" lawfully under the LMRDA. Maj. Op. at 31. I disagree with the majority's assertion that subsections (A) and (B) provide "alternative methods" for approving levies.

The language of § 101(a)(3) is ambiguous—it is not "plain," in spite of the majority's claim to the contrary, Maj.

---

pursuant to express authority contained in the constitution and bylaws of such labor organization: *Provided*, That such action on the part of the executive board or similar governing body shall be effective only until the next regular convention of such labor organization.

29 U.S.C. § 411(a)(3).

Op. at 18[2]—but the text and structure of § 101(a)(3) convince me that subsections (A) and (B) do not offer alternative methods for imposing levies. Rather, subsections (A) and (B) offer the only lawful methods for imposing dues and fees payable by members of distinct types of labor organizations. Levies payable only by members of a local labor organization like Local 166 can only be lawfully approved under the procedures provided in subsection (A) of § 101(a)(3), procedures that require approval by a majority vote of the local labor organization using a secret ballot, either at a meeting or by referendum. Section 101(a)(3) does not permit a larger labor organization to impose levies that affect only members of a local labor organization, even if the members of the local labor organization are also members of the larger labor organization. Not only is this the most natural reading of the language of § 101(a)(3), but it is also a reading that fully comports with Congress's broad purposes in enacting

---

[2] Ambiguity in the LMRDA comes as no surprise in light of the legislation's history. As explained by Archibald Cox, who the Supreme Court has described as "actively participat[ing] in shaping much of the LMRDA," *Wirtz v. Local 153*, *Glass Bottle Blowers Ass'n*, 389 U.S. 463, 468 n.6 (1968):

> The [LMRDA] contains more than its share of problems for judicial interpretation because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises essential to secure a majority.

Archibald Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959*, 58 Mich. L. Rev. 819, 852 (1960); *see also Usery v. Local Union No. 639 Int'l Bhd. of Teamsters*, 543 F.2d 369, 387 n.50 (D.C. Cir. 1976) (describing Cox as "a principal consultant to the draftsmen" of the LMRDA).

the LMRDA.  This reading is fully consistent with our prior reading of the statute.

As I read the Act, the dues increase imposed on members of Local 166 by delegates to the NCDCL violated the LMRDA regardless of the specific terms of the NCDCL constitution discussed by the majority.  My interpretation of the statute also leads to the result that the organizing fee approved in Resolution 12 did not violate the LMRDA, a result the majority also reaches based on its interpretation of the LMRDA.  Though I reach the same conclusions as the majority, I cannot endorse the majority's reasoning.

# I

The core dictate of § 101(a)(3) is that "the rates of dues and initiation fees payable by members of any labor organization . . . shall not be increased, and no general or special assessment shall be levied upon such members." In other words, the stated purpose of the Act is to protect union members against increases in due and fees.  This core dictate is—awkwardly—sandwiched between two "except clauses," the second of which has two parts.  In effect, there are three exceptions to the rule that members' dues and fees shall not be increased.

The first exception, provided in the opening words of § 101(a)(3), is for "the case of a federation of national or international labor organizations."   This section of the LMRDA imposes no further conditions on the actions of a federation of national or international labor organizations. At least as far as § 101(a)(3) is concerned, a levy governed by this exception appears to be lawful regardless of the method followed for approving the levy.  The two other exceptions,

provided in subsections (A) and (B), are for "the case of a local labor organization" and "the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations," respectively. Subsections (A) and (B) describe particular procedures that must be followed in approving increases in dues and fees. Structurally, the three exceptions combine to cover the full universe of labor organizations—"a federation of national or international labor organizations," "a local labor organization," and "a labor organization other than a local labor organization or a federation of national or international labor organizations."

Only subsections (A) and (B) are at issue in this case. These provisions are less than clear and may be read in a couple of ways. The majority reads (A) and (B) as describing the methods by which different classes of unions may raise dues and fees on "any labor organization."[3] The majority thus construes § 101(a)(3)(A) as though it began:

> a local labor organization shall not increase
> the rates of dues and initiation fees payable by

---

[3] *See, e.g.*, Maj. Op. at 21 ("[W]e hold that § 101(a)(3)(A) and (B) establish alternative methods *by which labor organizations are authorized to increase dues or initiation fees or to levy assessments on their members* . . . ." (emphasis added)). It seems clear that this is how the majority views the statute, even if the majority is at times inexact in its wording when discussing § 101(a)(3). *See, e.g., id.* at 17 ("Subsection (B) . . . applies to dues or initiation fees increases or assessments *imposed on members of a labor organization, 'other than a local labor organization or a federation of national or international labor organizations.'* Under subsection (B), *labor organizations, such as international unions, are authorized to increase dues or initiation fees or levy assessments* . . . ." (some emphasis added) (internal citation omitted)).

> members of any labor organization nor levy general or special assessments upon such members except (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting . . . .

Similarly, the majority would read (B) as though it began:

> a labor organization, other than a local labor organization or a federation of national or international labor organizations, shall not increase the rates of dues and initiation fees payable by members of any labor organization nor levy general or special assessments upon such members except (i) by majority vote of the delegates voting at a regular convention . . . .

For the majority, (A) and (B) are grants of power to the unions. They are "alternative methods for increasing dues or initiation fees or levying assessments." Maj. Op. at 18. The majority would read (B) to authorize, for example, a regional, national, or international union to raise the dues and fees of a subset of the members of that union so long as it followed the procedures set forth in (B), and the majority does not temper its view of subsection (B) with an equality or uniformity principle. It is one thing to argue that an international union may raise local dues *generally*, or even raise dues on a certain subset of members that spans many local unions; it is quite another to claim that the international may single out a local union and raise its local dues over the objection of the local's members. The majority's untempered "alternative methods" theory allows (B) to facilitate an end-

run around a local whose members do not want a dues increase, but whose leaders do, or worse yet, whose leaders do not have the voting power to overcome the will of an umbrella labor organization. An umbrella organization could even potentially use such an end-run to punish a local by raising its dues.

Although the majority's reading is plausible, I do not think this is the best reading of the statute. I read these sections to protect union members against undemocratic efforts to raise their dues and fees, not to enable the "international unions[] . . . to establish local unions' rates of dues" without regard for equality or uniformity. Maj. Op. at 17. I would read § 101(a)(3)(A) as though it began:

> the rates of dues and initiation fees payable by members of a local labor organization shall not be increased, and no general or special assessment shall be levied upon such members, except (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting . . . .

Similarly, I would read subsection (B) as if it began:

> the rates of dues and initiation fees payable by members of a labor organization, other than a local labor organization or a federation of national or international labor organizations, shall not be increased, and no general or special assessment shall be levied upon such members, except (i) by majority vote of the delegates voting at a regular convention . . . .

Under my reading, a union may levy dues and fees only on its own members by following the procedures set forth in (A) and (B). Nothing in § 101(a)(3) authorizes an umbrella labor organization to single out a local and raise the dues or fees of the local's members. Section 101(a)(3) may allow an umbrella organization to levy dues and fees on its own members, and perhaps even a subset of its members; but at the very least, § 101(a)(3) prevents such a levy from being imposed only on the members of a single subsidiary union.

I believe this to be a more natural reading of § 101(a)(3).[4] Section 101(a)(3)'s exceptions qualify the core dictate's prohibition on increases in dues and fees "*payable by* members of any labor organization" or assessments "*levied upon* such members." 29 U.S.C. § 411(a)(3) (emphasis added). Thus, subsection (A) dictates the procedures that must be followed for a levy payable by members of a local labor organization. Although subsection (A) is not so didactic as to specify which labor organization's "members" should take part in the required secret ballot voting, it only makes sense to read this as connected to the "members" mentioned in the core dictate, that is, as referring to the members of the labor organization who will pay the levy.

---

[4] The majority asserts that my "interpretation of the statute . . . does not account for its plain text, particularly the word 'or' that connects 29 U.S.C. §§ 411(a)(3)(A) and (B)." Maj. Op. at 18 n.10. I confess to not accounting for "plain text" where there is none. The "or" suggests that subsections (A) and (B) describe distinct methods by which different labor organizations may raise dues and fees on their own members; the "or" does not suggest that subsections (A) and (B) provide alternative methods by which a regional organization, or any other umbrella labor organization, may raise dues or fees only on the members of a smaller labor organization.

Similarly, it is only natural to read the exception in subsection (B) for "the case of a labor organization, other than a local labor organization or a federation of national or international labor organizations" as qualifying the core dictate's general prohibition on levies payable by members of those unions. Thus, subsection (B) dictates the approval methods that must be followed in order for a levy payable by members of a "labor organization, other than a local labor organization or a federation of national or international labor organizations," to be lawful under § 101(a)(3). If anything, subsection (B) is even more clear than subsection (A) because it identifies the "members" to be involved in the voting. Each voting option under subsection (B) calls for a vote among members or representatives of "such labor organization," which logically must refer back to the labor organization whose members will be paying the levy. As the Tenth Circuit explained, subsection (B) "makes it clear that the increased dues must be enacted by the relevant body 'of such labor organization,' that is the organization whose members will be required to pay the increased dues." *Patterson v. United Bhd. of Carpenters & Joiners of Am. AFL-CIO*, 906 F.2d 510, 515 (10th Cir. 1990).

In sum, subsection (A) prescribes the required voting methods for the lawful approval of a levy payable by members of a local labor organization, and requires majority approval of the members of the local labor organization voting by secret ballot; and subsection (B) prescribes the required voting methods for the lawful approval of a levy payable by members of a labor organization other than a local labor organization or a federation of national or international labor organizations, and requires no secret ballot. The subsections are symmetrical and preserve the rights of union members to vote directly on any dues increases or, under

subsection (B), at least to be equitably represented before any dues are levied on them.  An international union can impose due and fees on its international members, a regional union on its regional members, and a local union on its members. This outcome is respectful of principles of equality and uniformity that are disregarded by the majority's approach.

## II

My reading of § 101(a)(3) set forth above is supported by Congress's broad objectives in enacting the LMRDA, and particularly Title I of the LMRDA, which includes § 101(a)(3).  Title I of the LMRDA is self-consciously titled "Bill of Rights of Members of Labor Organizations." 29 U.S.C. §§ 411–15; *see also* Maj. Op. at 13 (stating that Title I is a "statutory 'Bill of Rights' 'specifically designed to promote the full and active participation by the rank and file in the affairs of the union.'" (quoting *Hall v. Cole*, 412 U.S. 1, 7–8 (1973)) (internal quotation marks omitted)).  The Supreme Court has said that "Title I [of the LMRDA] is designed to guarantee every union member equal rights to vote and otherwise participate in union decisions." *Local No. 82, Furniture & Piano Moving v. Crowley*, 467 U.S. 526, 536 (1984).  "[T]he rights enumerated in Title I [are] vital to the independence of the membership and the effective and fair operation of the union as the representative of its membership." *Hall*, 412 U.S. at 8 (internal quotation marks omitted).  "In providing such protection, Congress sought to further the basic objective of the LMRDA: 'ensuring that unions [are] democratically governed and responsive to the will of their memberships.'" *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347, 352 (1989) (alteration in original) (quoting *Finnegan v. Leu*, 456 U.S. 431, 436 (1982)).

As the majority notes, and as we have previously recognized, the purpose of § 101(a)(3) specifically "'is to curb the potential for autocratic and unrepresentative rule of union officers by preventing the leadership of a union from imposing arbitrary financial extractions unilaterally on its membership.'"   Maj. Op. at 15 (quoting *Burroughs v. Operating Eng'rs Local Union No. 3*, 686 F.2d 723, 728 (9th Cir. 1982)).  "Section 101(a)(3) was designed to vest control over increases in rates of dues in the union members, not the union management."  *Burroughs*, 686 F.2d at 728.  It thus "guarantee[s] a member's 'right to participate in deciding upon the rate of dues, initiation fees, and assessments.'" *Am. Fed'n of Musicians v. Wittstein*, 379 U.S. 171, 181 (1964) (quoting H.R. Rep. No. 741, at 7 (1959)).  Judge Posner has described § 101(a)(3) as "intended to ensure that dues or assessments are not levied by unrepresentative union leaders," and as "intended to bar taxation without representation."  *Michelotti v. Air Line Pilots Ass'n*, 61 F.3d 13, 15 (7th Cir. 1995); *see also Burroughs*, 686 F.2d at 730 (describing a situation in which union leadership had the power to decide whether or not the dues of local union members would be increased, without submitting the matter to a vote of the local union's  members, as "a result . . . Congress intended to prohibit when it enacted section 101(a)(3)").

These principles were violated when members of Local 166—and no one else—had their *local* dues increased by the NCDCL following a vote at a convention of sixty delegates only two of whom were Local 166 members.  Though it is true that Local 166 was minimally represented at the convention that raised its dues, it is hard to say that an interpretation of § 101(a)(3) that allows such uneven "taxation" from above is supported by the policy of

"ensur[ing] that dues or assessments are not levied by unrepresentative union leaders." *Michelotti*, 61 F.3d at 15. Rank and file members of Local 166 are not full and active participants in their own union affairs if they do not get to vote whether to increase their own dues, but are subject to the votes of members of other local unions, whose dues are not at risk. The right to democratic control over such levies is one of the rights guaranteed by the LMRDA in § 101(a)(3), and the procedure followed here violated some pretty basic tenets of American democracy.

The democratic principles behind the LMRDA are reflected in my interpretation of § 101(a)(3), which requires local union members to approve their own dues increases. And these principles would be violated by a reading that would permit a regional labor organization to raise the dues of one local, while maintaining a lower assessment for everyone else. This point was previously recognized by the district court in *White v. Local 207*, which said that "[a] holding that a district convention could set local dues for one single local union would be to completely sterilize the provisions of [§ 101(a)(3)(A)]." 387 F. Supp. 53, 56 (W.D. La. 1974). A regional union such as the NCDCL may no more raise the dues of a single local union than Congress may tax the citizens of one state at a higher rate than citizens of other states. *Cf., e.g.*, U.S. Const. art. I, § 8, cl. 1 ("[A]ll Duties, Imposts and Excises shall be uniform throughout the United States."); *id.* art. I, § 9, cl. 6 ("No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another . . . .").

The majority characterizes its reading of the statute as balancing the democratic principles underlying the LMRDA with "umbrella labor organizations' interest in self-

governance," noting parenthetically that "Congress meant to further the LMRDA's basic policy of promoting democratic union governance 'with a minimum of interference in the internal affairs of unions.'" Maj. Op. at 18 (quoting *Crowley*, 476 U.S. at 539). Such balance is not lost in my interpretation of the statute, as § 101(a)(3) still offers various lawful approval methods under each of subsection (A) and subsection (B). By contrast, the union members' "Bill of Rights" is of no value if it can be trumped so easily by the majority's "hands off" principle.

## III

My reading is also fully consistent with our prior reading of § 101(a)(3), while the majority's position outflanks anything that our court, or any other court, has previously approved. Although § 101(a)(3) has not commanded much judicial attention, we previously construed it in *Mori v. International Brotherhood of Boilermakers*, 653 F.2d 1279 (9th Cir. 1981). In *Mori*, we held that the LMRDA authorized an international union to establish minimum dues for members of the international union who worked in the construction trade by a majority vote of delegates at the convention of the international union under subsection (B) of § 101(a)(3). *Id.* at 1284–85. This decision might be understood as endorsing the position that subsection (B) generally allows any "labor organization, other than a local labor organization or a federation of national or international labor organizations," to increase the local dues of any subset of that labor organization's members in any manner approved by a majority of delegates at a convention of the labor organization, including any increase imposed on a subset consisting only of the members of one affiliated local union.

*See* Maj. Op. at 17–22, 31.  Our decision in *Mori*, however, was not so broad.

In *Mori* we considered whether an international union could establish minimum dues "for a single craft within affiliated local unions." *Mori*, 653 F.2d at 1280.  We approved the dues increase for "field construction members" who belonged to various unions within the international; the increase did not affect the dues of other members of the locals. *Id.* at 1281.  The increase "affect[ed] neither a single local nor all locals, but all locals within a single craft." *Id.* at 1285 n.2.  We briefly considered the broad proposition that "§ 101(a)(3) places *no* substantive limitations on convention action concerning dues" and thus allows an appropriately established convention of an umbrella labor organization to "establish local minimums in any way a majority of delegates select," but concluded that we "need not embrace so expansive a view of § 101(a)(3)(B) in order to sustain the convention action" at issue. *Id.* at 1284.  In so concluding, we suggested that such a broad reading of § 101(a)(3)(B) "might seem at odds with the congressional purpose of shielding union members from 'arbitrary financial actions.'" *Id.* (quoting 105 Cong. Rec. 2668 (1959)).

In a pre-*Mori* case, *Ranes v. Office Employees International Union*, the Seventh Circuit approved local dues increases enacted by an international union consistent with the procedures required by § 101(a)(3)(B).  317 F.2d 915, 916, 918 (7th Cir. 1963).  But those increases were across-the-board increases applicable to every local union in the international. *Id.* at 916.  The international union could have accomplished the same thing by raising its own fees and remitting the funds raised to the locals.  The Seventh Circuit recognized that the international had "acted lawfully within

a traditional sphere of its power to control its affiliated local unions." *Ranes*, 317 F.2d at 918. Nothing in *Ranes*, however, sanctions an international singling out one local and increasing its dues. *See id.* at 918 n.6 ("The provisions of (A) govern the dues structure of independent company and unaffiliated local unions, and should apply, as well, to increases in the dues charged by affiliated locals above the constitutional minima prescribed by their parent unions.").

As the Tenth Circuit explained in *Patterson v. United Brotherhood of Carpenters & Joiners of America AFL-CIO*, my reading of the statute is consistent with both *Ranes* and *Mori*. In *Patterson*, the Tenth Circuit held that an international union could not lawfully establish minimum dues for the seven local unions affiliated with an umbrella district council. 906 F.2d at 512–15. In so holding, the court asserted that subsection (B) of § 101(a)(3) "makes it clear that the increased dues must be enacted by the relevant body of . . . the organization whose members will be required to pay the increased dues," *id.* at 515 (internal quotation marks omitted), a reading of subsection (B) that is consistent with my interpretation. The *Patterson* court concluded that its reading was consistent with *Ranes* and *Mori*. As the *Patterson* court explained:

> This reading of the statute is not . . . inconsistent with the cases affirming an international union's authority to establish dues payable to affiliated local unions because these cases each involved an across-the-board dues increase for all members of the international union. This interpretation of the statute is also consistent with *Mori*'s holding that international union convention delegates

may vote a dues increase for a minority of union members because the affected members in that case were not, as here, all members of a separate and distinct "labor organization," but rather were members of a specific craft who apparently were dispersed throughout the international union's affiliated locals. Thus, the dues increase in *Mori* was again an across-the-board increase applicable to all members of the international union who qualified and was not, as here, a dues increase imposed solely on members of a distinct "labor organization."

*Patterson*, 906 F.2d at 515 (internal citations omitted). As with the dues increase in *Patterson*, which was imposed solely on members of a distinct district council, the dues increase in the instant case was imposed solely on the members of a distinct local labor organization; it was not, as in *Mori*, an across-the-board dues increase impacting all members of an umbrella labor organization who fit some criteria other than membership in a distinct smaller organization.

Moreover, our case is also distinguishable from *Mori* in a manner in which *Patterson* was not. *Patterson*, like *Mori*, involved the imposition of a dues increase by an international labor organization. Here, by contrast, the dues increase in question was imposed by a district council. This may not be relevant when it comes to the language of § 101(a)(3), under which both international unions and district councils fall under subsection (B)'s category of "labor organization[s], other than a local labor organization or a federation of national or international labor organizations." It is, however,

relevant when considering the extent to which *Mori* controls our inquiry. In *Mori*, we based our approval of an international labor organization's imposition of minimum dues applicable only to members in a certain craft, across all affiliated local unions, on the fact that "an international's setting of local dues is part of 'traditional structures and practices,'" combined with "the Supreme Court's intimation . . . that traditional practices are relevant to an interpretation of the Act." *Mori*, 653 F.2d at 1284 (quoting *Ranes*, 317 F.2d at 917). In *Mori*, this court had been presented with substantial evidence of the traditional practice of international labor organizations playing a role in setting dues for affiliated locals. *Id.* at 1283–84. This traditional practice, which was arguably also relevant in *Patterson* to a dues increase imposed by an international union on members of several local unions, is not relevant to our analysis of the imposition of dues on members of a local labor organization by a district council rather than an international labor organization.

Finally, in *Mori*, we recognized that, in cases where a labor organization is imposing a levy on a minority of its members, it is relevant whether there is any "reason to distrust the democratic process at work." *Mori*, 653 F.2d at 1285. In finding no reason to distrust the democratic process in *Mori*, we relied on (1) the fact that the increased dues would be retained by local construction lodges for their own benefit; (2) the representation of members of the construction trade by delegates at the convention of the international labor union that approved the dues; and (3) the lack of anything in the record demonstrating that the majority of the international union was seeking to exploit a minority. *Id.* at 1284–85. Here, at the very least, the fact that only two of the sixty delegates who approved the dues increase represented the members of Local 166 who would bear the full brunt of the

increase provides ample reason to distrust the democratic process at work. The LMRDA protects union members from such abuses.

## IV

In the instant case, the organizing fee approved in Resolution 12 did not violate the LMRDA. The organizing fee was a levy imposed upon the members of an international labor organization (the Laborers International Union of North America, or LIUNA), and thus was lawful as long as the method of approval comported with subsection (B) of § 101(a)(3). One of the allowable methods under subsection (B) is "a majority vote of the delegates voting at a regular convention, or at a special convention of such labor organization held upon not less than thirty days' written notice to the principal office of each local or constituent labor organization entitled to such notice." This is exactly the manner in which Resolution 12 was approved, so the organizing fee was legally imposed, as the majority concludes. Maj. Op. at 23, 27.

The dues increase imposed on members of Local 166 by the NCDCL, on the other hand, violated the statute. The dues increase was imposed only on members of Local 166, a local labor organization, and thus required approval via one of the methods dictated by subsection (A) of § 101(a)(3), each of which require a secret ballot vote of the members of Local 166. No secret ballot vote was taken of the members of Local 166, so the dues increases was not lawful. The majority comes to the same conclusion, but bases its decision on the fact that, under the NCDCL constitution, the "members" of the NCDCL are the delegates from the affiliated local unions rather than the members of the local unions. Maj. Op. at

28–31.  I offer no comment on the validity of this rationale for the majority's holding.  Even if the members of Local 166 are in fact members of the NCDCL, because the exception covering levies payable by members of the smaller labor organization—and not also the exception governing levies payable by members of the larger umbrella labor organization—governs, the dues increase was not lawful.

**V**

Section 101(a)(3) of the LMRDA is best read as requiring the members of a local labor organization to approve in a secret ballot all dues and fees increases applicable only to them.  The LMRDA was enacted to protect rank and file union members from undemocratic union decisionmaking.  The dues increase imposed on Local 166 in this case was approved in a manner that does not reflect this purpose.  The majority reached the right conclusion, but its interpretation of § 101(a)(3) is problematic and will result in the acceptance of undemocratic labor processes in future cases.  I can only concur in the judgment.